Miller and al. v. English and al.

---

## MILLER AND AL. v. ENGLISH AND AL.

1. In a religious society incorporated under the general act, the acts and proceedings of a majority at a regular meeting, are binding on the minority in temporal affairs. Matters of faith are governed by a different rule.

2. When a religious society, incorporated under the general act, hold a new election of trustees for the purpose of being incorporated, if the object of the new election and certificate is to preserve, and not to change or dissolve the old corporation. The new corporation is a continuance of the old.

3. Relators, on application for quo warranto against intruders into offices or franchises claimed by the relators, must shew a title in themselves.

4. When the usual place of meeting of a society has been changed by them, an election of trustees at the old place of meeting is invalid.

A rule has been obtained by Henry Miller and others the relators, that Isaac English and others, respondents, shew cause

why information in the nature of a *quo warranto* should not is-
sue against them the respondents to remove them from the of-
fice of·" Trustees of the Anti-pedo Baptist Society, meeting in
the town of Salem in the state of New Jersey."

On the third of July 1786, the Baptist Society in the town
of Salem became incorporated under the act of March 16, 1786,
by the name of " *The Trustees of the Anti-pedo Baptist Society,
meeting in the town of Salem in the state of New Jersey.*"   Trus-
tees were regularly chosen and sworn into office, and the name
of the incorporation certified, filed, and recorded, and hencefor-
ward there was a regular succession of trustees, without ques-
tion of their authority, or of their acting under the original in-
corporation, till sometime in 1843 or '44, when after diligent
search made, neither the record of the incorporation, or the ori-
ginal certificate thereof could be found.   There were then in
office six trustees, viz: Stephen Mulford, William K. Sea-
grave, William Johnson, Henry Fries, John M. Challis, and
William Robinson, and there was one vacancy.   Of the six,
the first, Mulford, has departed this life since the present con-
troversy.   William Robinson is one of the relators, and the
other four are defendants in this application.   In the church
book of minutes, under date of Jan. 20, 1844, there is this
entry.   " Whereas it appears from the records of this church,
that we have been incorporated under the act of the Legislature
of the state of New Jersey, passed 16th March, 1786, but that
the record thereof cannot be found in the clerk's office of the
county of Salem.   It is therefore resolved by this church to be-
come incorporated under the act of the Legislature of this State,
incorporating religious societies, passed June 12, 1799, and for
that purpose we do appoint Saturday the 3d of February next,
at 2 P. M., for the members of this church and congregation to
meet in their meeting-house in the town of Salem, for the pur-
pose of electing seven trustees for this church and congrega-
tion."   Accordingly, on the 3d of February, 1844, as appears
by. the entry of that date in the church book of minutes, the
church and congregation met pursuant to due and regular no-
tice, and elected by ballot seven trustees, viz: Stephen Mul-
ford, Senr. Isaac English, Henry Freas. Esq. John M. Challis,

William K. Seagrave, William Johnson, and John M. Cooper. Henry Freas was elected, though his name has been accidentally omitted in the entry. English was elected to fill the vacancy, and Cooper was elected in the place of Robinson.

Afterwards, on the 5th of February, 1844, these seven persons thus chosen trustees, filed in the office of the clerk of the county, the certificate of their election and their official oaths—the former setting forth that it appearing by the church books that they had been duly incorporated under the act of 1786, on the third of July of that year, by the name of "The Trustees of the Anti-pedo Baptist Society, meeting in the town of Salem in the state of New Jersey," and that the certificate and the qualifications of the trustees were recorded in the clerk's office of the county, and that said trustees and their successors, by the name of the corporation aforesaid, had taken and exercised all the functions of said corporation, from the said 3d of July 1786, to the said 5th of February 1844; but after diligent search, neither the record of the certificate of incorporation, or the oaths of the trustees, or the original document could be found; it was thereupon determined to be expedient and proper to incorporate the Baptist church and congregation under the act of 1799, for the incorporation of the trustees of religious societies. The trustees accordingly made out and signed their certificate of the time and place of their election, according to the notice and the requirements of the statute, and that they had severally taken the oaths prescribed by law, and that they had taken upon themselves the name of "The Trustees of the Anti-pedo Baptist Society, meeting in the town of Salem in the state of New Jersey," request the certificate to be recorded, and it is done accordingly. To all this proceeding there appears to have been no opposition; and the church and congregation and incorporation proceeded on as formerly, keeping its regular minutes of proceedings in the same church book formerly used. The record of the old certificate of incorporation was not found till about a month after the new certificate was recorded. It was then—as the witness J. P. Nicholson states—discovered to have been recorded in the book of records, information of which fact was given to one of the trustees, and became known, but no

change took place in the accustomed regular proceedings of the society and incorporation. At length a new meeting-house, which had been for some time in construction, and much longer it would seem from the evidence, in contemplation, was completed; and at a regular church meeting held November 14, 1846, a resolution was unanimously adopted, that on Saturday the 12th of December following, the new meeting-house should be dedicated, and that from and after that day all the stated meetings of the church be held in that house.

These resolutions were adopted at a regular monthly meeting of the society, held in the old house, then the regular place of meeting; a pretty large number attended, and it would seem as well from the evidence as the minutes, that they were adopted unanimously, though William Brown, one of the relators, rose up and said something. Some present understood him as favoring the resolutions; others, that he stated that he and others should remain in the old house. There does not, however, seem to have been any vote in opposition to the resolutions.

Afterwards, on the 16th of January, 1847, the relators and those they represent, claiming to be the ancient religious society of the Baptist church in Salem, held a meeting in the old church as meeting-house, and elected six trustees, that is, all the relators except Wm. Robinson, who was one previously, the other six being elected to supply the vacancy caused by the death of Wm. Darmon, and "in place of such others who have vacated their office of Trustees on or about the fifth day of February 1844." A sworn copy of the certificate of election and official oaths are in evidence, as taken from the church book of the relators, who claim to be the regular successors of the first trustees chosen and incorporated in 1786.

Argued before WHITEHEAD and RANDOLPH, JJ.

The opinion of the court was delivered by

RANDOLPH, J. There is but one regular incorporation known as "The Trustees of the Anti-pedo Baptist Society, meeting in the town of Salem in the state of New Jersey"—and the object

of the present proceeding is to test who are the representatives of that incorporation. If the relators, they are entitled to have their proceedings in nature of a quo warranto filed and prosecuted to judgment, if the defendants think the application should not be granted. The whole proceedings are now before the court by affidavit and otherwise, and as controversies of this character should be as speedily determined as possible, the court will not hesitate to give a final decision as far as may be in the proceedings.

1. This is not a case of secession of a part of a society ; the act of going from the old meeting-house to the new one, was the act of the society, and they took with them all the rights of the society and body corporate, vacating none, and leaving none behind ; so that no persons, after such removal, could remain behind and claim to be the ancient, or remains of the ancient society. Religious societies, acting as corporate bodies under the statute, must be governed by majorities, and minorities must submit or secede. I do not now speak of matters of faith and doctrine : what is a secession from the faith or doctrine of a church may be governed by very different principles, and depend less on numbers than on principles. But in the regulation of the temporal concerns of the society, I know of no exception, where the minority must not yield to the majority acting within the scope of their authority and proceeding according to law. It must be so in the nature of things, else upon every change of affairs in a church, a very small minority would have power to turn out a very large majority.

2. But it is urged that the respondents forfeited their rights under the old incorporation by becoming incorporated in 1844 under the act of 1799. I do not think so. The object of the re-incorporation was palpable, and is set forth in the act itself. It was to perpetuate the old society in the name of the old incorporation, under a mistake that the old certificate of incorporation had been lost. The election of the defendants as trustees, was the act of the whole body, and their certificate of renewal of the corporate name under the act of 1799, was acquiesced in by the whole body, relators and all, for nearly two years. The acts of 1786 and of 1799 are almost identical, the

former only requires advertisements (in three places), the latter an advertisement of the time of electing trustees. If the legal notice was given, the defendants were all duly elected trustees on the 3d of February, 1844, and the subsequent act of the 5th of February, of the trustees to become incorporated, or re-incorporated, was either a nullity caused by the mistake as to the records having been lost, as was supposed, or else a lawful act to perpetuate the ancient incorporation.

If the act of re-incorporation by the trustees was a nullity, as seems generally to be supposed, and the proceedings of the church and congregation of the 3d of February, 1844, in choosing the trustees, was not according to lawful notice, as required by the act of 1786. Then only four of the defendants, viz: Henry Fries, John W. Challis, William K. Seagrave, and William Johnson, together with William Robinson, are the only true trustees, there being two vacancies by deaths; and as the four who are the defendants constitute the majority of the Trustees, they have by statute the power of the corporation and are not usurpers, and no writ of quo warranto should issue against them, or against the corporation which they represent.

But was the filing the certificate and becoming incorporated under the act of 1799 a nullity? It is not pretended that it destroyed the old incorporation, but that it caused the amotion of the defendants as trustees thereof, and the relators, by reason of their appointment, became the legal trustees of the old incorporation, and regular successors of the first trustees. Lord Mansfield, in *Rex* v. *Richardson*, 1 *Burr*, 539, considered that there were three causes for the amotion of a corporate officer. 1. The commission of such offences as would render the offender unfit to hold the office. 2. The doing of such acts as would be in violation of his oath and duty. 3. The committing such an offence as would be in violation of the officer's duty and render him liable to indictment. See also *Angell and Ames on Corp.* 246, &c. The officers in this case have done no act which was incompatible with their duty—nothing which would render them liable to be removed from office, but on the contrary, they did what at the time the whole society conceived to be right, and sanctioned by their votes or acquiescence.

They supposed that the corporate papers and record thereof had been lost, and that in order to preserve their property, it was necessary to become re-incorporated, for the purpose, therefore, not of division or secession, but to revive and perpetuate the old incorporation, and preserve unimpaired the entire rights of the old body politic, they made out a new certificate for incorporation under the act of 1799, and expressed the cause and the object of their proceeding upon the face of the instrument itself. This was no cause for forfeiture of office or of corporate rights.

Nor do I see anything incompatible in the old incorporation becoming revived or re-incorporated under the act of 1799, which in terms applies to "every religious society or congregation of christians entitled to protection." Under the old act, the society could only hold property to the annual value of five hundred pounds. By the act of 1799 this sum was extended to two thousand dollars. But although for this purpose re-incorporation was not necessary, yet I see nothing in the law to prevent the trustees, if for any purpose they desired it, from filing anew their certificate and oaths and declaration of a corporate name, as was done in this instance; and thus, whilst they preserved their identity, became a religious corporation under the act of 1799. This is repeatedly done by legislative enactment, and in England by royal charter—why may it not be done under a general act of incorporation, without the loss of identity or forfeiture of franchise? In *The Colchester Corporation* v. *Seaber*, 1 *Burr* 1866, it was held that where a corporation, by death of some of its members, became disabled to act, and dormant, and a new charter was granted, that the acceptance thereof did not create a new, but merely revived the old corporation. "Whenever a corporation," says Wilmot, J. "accepts a new charter, it *remains* to every intent and purpose as it did before, *though* the name be altered." Referring to *Haddock's case* *T. Raym.* 439, where it is said that the new "charter does not merge or extinguish any of the ancient privileges, but the corporation may use them as before." And to the same effect is *Rex* v. *Pasman*, 3 *T. R.* 199, and opinion of *Ld. Kenyon, p.* 241. These are, it is true, cases of royal charters of incorporation, but

the same principles apply, whether the creation or removal is by the legislature, or by a general act of incorporation. *Angell & Ames on Corp.* 513. The question of identity, that is, whether the new act creates a new body politic or corporate, or merely revives an old one, is one of intention. " To ascertain whether a charter creates a new corporation, or merely continues the existence of an old one, we must," says Story, J. " look to its terms, and give them a construction consistent with the legislative intent, and the intent of the corporators." *Bellows* v. *Hallowell and Augusta Bank,* 2 *Mason R.* 43. If the present case is to be governed by the intention of the parties, little doubt could arise in the matter. But it is not necessary to look further into the defendant's case; for whether all the defendants are legal trustees, or only four of them, the present application must fail as to all and each of the defendants. For, whether Isaac English be a trustee or not, the relators must shew that *they* have a right to inquire by *what authority* he exercises the office of trustee. The relators desire to be the legal trustees of the society, and as such, complain of the defendants and apply for a *quo warranto.* From the evidence and proceedings before us, they cannot in that character call on the defendants. 1. They were elected at the old meeting house after that had ceased to be the usual place of meeting of the society, where only, trustees can be lawfully chosen by the acts of 1786 and of 1799. 2. They were not elected by the old society, for they had, by previous resolution, removed from the old meeting-house. 3. The old society corporation and trustees were still in existence, and there were in any view of the case at least five trustees in office, so that the relators could in no legal way have been elected trustees of the old corporation. 4. If the old meeting-house was the usual place of meeting of the society whom the relators represent, they may have been elected trustees of such society; but that is not the old society or incorporation, and that election will not entitle them to a *quo warranto* against the respondents, or any of them.

Let the rule to shew cause, be discharged with costs.

CITED *in Den* v. *Pilling,* 4 *Zab.* 661; *Worrell* v. *Presb. Church,* 8 *C. E. Gr.* 103.